# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

Civil Action No. 1:24-cv-03560

LEAH SCHAATT,

      Plaintiff,

v.

REVEN HOLDINGS, INC. d/b/a REVEN
PHARMACEUTICALS, REVEN PHARMACEUTICALS, INC.,
BRIAN D. DENOMME, PETER B. LANGE, MICHAEL A.
VOLK, HEALTH ANALYTICS & RESEARCH SERVICES, LLC,
and JOHN DOE and JANE DOE;

      Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff Leah Schaatt, by and through undersigned counsel, files her Complaint and Jury Demand against Defendants Reven Holdings, Inc. d/b/a Reven Pharmaceuticals, Reven Pharmaceuticals, Inc., Brian D. Denomme, Peter B. Lange, Michael A. Volk, and John Doe, and states as follows:

### PARTIES

1.     Plaintiff Leah Schaatt is an individual and at the time of the events described below was a resident of Colorado.

2.     It is believed and therefor averred that Defendant Reven Holdings, Inc. ("Reven") is a Delaware corporation with its principal place of business in Westminster, Colorado.  Reven does business as "Reven Pharmaceuticals."

3.     It is believed and therefor averred that Defendant Reven Pharmaceuticals Inc. ("Reven Pharmaceuticals") was a Florida corporation formed in October 1999, located in Golden,

Colorado. On August 21, 2018, pursuant to an Asset Contribution Agreement and Plan of Reorganization, Reven Pharmaceuticals transferred its assets and liabilities to Reven's wholly owned subsidiary Reven, LLC, and Reven Pharmaceuticals shareholders became proportionate shareholders of Reven.

4.      It is believed and therefor averred that Defendant Brian Denomme is a resident of Northville, Michigan and co-founder, member of the board, and president of Reven.

5.      It is believed and therefor averred that Defendant Peter Lange is a resident of San Antonio, Texas and co-founder, member of the board, and chief executive officer of Reven.

6.      It is believed and therefor averred that Defendant Michael Volk is a resident of Broomfield, Colorado and co-founder, member of the board, and chief strategy officer of Reven.

7.      It is believed and therefor averred that Health Analytics & Research Services, LLC ("Health Analytics") is a Colorado limited liability company with an address in Broomfield, Colorado that was a shell company owned and operated by Volk, Denomme, and Lange.

8.      It is believed and therefor averred that Defendants John Doe and Jane Does, whose names are currently unknown at this time, acted in concert with the Defendants named here and engaged in fraudulent transfers in an effort to hinder, delay, or defraud a creditors.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant to the Securities Act, 15 U.S.C. § 77v(a).

10.      This Court has personal jurisdiction over the Defendants and venue is proper in the District Court of Colorado pursuant to the Securities Act, 15 U.S.C. § 77v(a) and because many of the acts and transaction constituting violations of the Securities Act and basis for the claims

asserted occurred in this district and one or more of the Defendants resides or has its principal place of business in this district, *see* 28 U.S.C. § 1391(b)(2).

11.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

## FACTUAL ALLEGATIONS

12.     Ms. Schaatt is a defrauded investor that relied upon the false and misleading statements made by Lange, Denomme, and Volk in connection with the offer and sale of securities.

13.     Ms. Schaatt invested $7 million in Reven because she was led to believe that her money would be used to develop a drug called Rejuveinix ("RJX"); however, Defendants misappropriated Ms. Schaatt's money through various means, including but not limited to funneling money through a shell company, buy expensive jewelry, pay personal expenses, etc.

14.     In May 2019, Ms. Schaatt was introduced to Peter Lange by a mutual acquaintance. Ms. Schaatt met with him in person on July 12, 2019, and afterwards he provided her with some slide decks about Reven Holdings, Inc. d/b/a Reven Pharmaceuticals ("Reven") and its drug, RJX, as well as a Private Placement Memorandum ("PPM") dated August 31, 2018.

15.     At that July 2019 meeting, Lange told Ms. Schaatt about Reven and its development of RJX, and solicited her to invest.

16.     Towards the end of August, Ms. Schaatt emailed Lange to let him know she was interested in proceeding with an equity investment in Reven.

17.     On September 9, 2019, Lange sent additional investment documents, including the August 31, 2018 PPM again and a subscription agreement, as well as a Reven shareholder slide deck (stating on the cover page "Revision: August 2019"). The email, PPM, subscription

agreement, and shareholder slide deck are attached as **Exhibit A, SEC-SchaattL-E-0003806-3902**.

18. The August 31, 2018 PPM attached to that email made several representations, including:

a. "This Confidential Private Offering Memorandum (the 'Memorandum') has been prepared by the Company." Ex. A at SEC-SchaattL-E-0003808.

b. "Reven Holdings, Inc., a Delaware Corporation, ('Reven' or the 'Company'), was formed in August of 2018 as a biotech/pharmaceutical holding company with the purpose of acquiring and commercializing pharmaceutical assets in various stages of clinical development. The Company's current portfolio of assets includes its wholly owned subsidiary, Reven, LLC, a Delaware limited liability company, which holds a novel and potential first in class cardiovascular drug therapy currently approved to pursue Phase II clinical trials in the United States and Europe. For the purposes of this Memorandum references to 'Reven' or the 'Company' from an operational standpoint shall include Reven, LLC. The Company's assets including, without limitation, Reven, LLC and its associated assets, were acquired via an Asset Contribution Agreement from a company that the executive management team has been commercializing under another corporate structure since 2012." SEC-SchaattL-E-0003813.

c. "INTELLECTUAL PROPERTY The Company currently has patents and patent applications in two different families of filings. The intellectual property and claims contained in each family are in various phases of development and prosecution in several countries throughout the world. There are derivative patents from the main patent families known as 'Child' patents. In all, the company has been granted 7 patents related to the RJX formulation, process for combining the elements and the applications for use." SEC-SchaattL-E-0003827.

4

        d.      The Use of Proceeds section represented, among other things, as follows:

**USE OF PROCEEDS**

The following sets forth summary information about the estimated use of offering proceeds, based on the sale of $200,000,000 of the Shares. (note that the Company is authorized to sell up to $350,000,000 of Shares in this Offering). However, the actual net proceeds the Company will receive will depend on the number of Shares sold. The planned use of proceeds shown below is subject to change based on the actual net proceeds received from this Offering, actual expenses, changes in general business, economic and competitive conditions, timing and management discretion, each of which may change the amount of proceeds expended for the purposes intended.

Anticipated Costs 48 Months – Clinical Development, EMA and FDA Approval

Reven, Inc. Use of Funds - 48 Months* including Phase I/II Trial and additional New Drug Applications
*from time of funding

| Development/Clinical Trial | Months 1 - 6 | Months 7 - 12 | Months 13 - 18 |
| --- | --- | --- | --- |
| Product Manafacture costs for Clinical Trial Inventory (Mos 7 - 12 for PAD/AIS Trials) | 350,000 | 1,050,000 | 1,750,000 |
| 90-Day CLI Adjunct Therapy Trial (Acute Perfusion label)* | 5,000,000 | 6,000,000 | 10,000,000 |
| Biomarker analysis throughout trial - R & D for label expansion | - | 2,000,000 | 1,750,000 |
| Additional NDA Filings to expand label - patient trials (PAD and Acute Ischemic Stroke) | - | - | 12,000,000 |
| General Administrative and Payroll Operating costs | 2,500,000 | 2,500,000 | 2,500,000 |
| Patent and other Legal Services | 135,000 | 210,000 | 210,000 |
| Sales/Marketing (Includes travel costs & Int'l Development) | 100,000 | 225,000 | 350,000 |
| Corporate Structure costs - Legal, Accounting, Securities Compliance | 75,000 | - | - |
| Rent | 71,220 | 71,220 | 71,220 |
| Misc (utilities, phones, office supplies, etc...) | 42,000 | 42,000 | 42,000 |
| Accounts Payable | 1,607,070 | - | - |
| TOTAL ESTIMATED CAPITAL REQUIREMENT | 9,880,290 | 12,098,220 | 28,673,220 |
| | | | |
| Aggregate Total | 9,880,290 | 21,978,510 | 50,651,730 |

|  | Month 19 - 24 |
|---|---|
| Development/Clinical Trial |  |
| Product Manafacture costs for Post Market Inventory @ 150,000 units per month | 4,050,000 |
| 1 Year Limb Salvage Trial + PAD Approval from FDA | 7,500,000 |
| Biomarker analysis throughout trial - R & D for label expansion | 1,750,000 |
| Post-market studies for expanded label claims - patient trials (PAD, AIS, CAD) | 18,750,000 |
| General Administrative and Payroll Operating costs | 1,500,000 |
| Patent and other Legal Services | 150,000 |
| Sales/Marketing (Includes travel costs & Int'l Development) | 450,000 |
| Corporate Structure costs - Legal, Accounting, Securities Compliance | 250,000 |
| Rent | 54,000 |
| Misc (utilities, phones, office supplies, etc…) | 42,000 |
| Accounts Payable | - |
| TOTAL ESTIMATED CAPITAL REQUIREMENT Months 19 - 42 | 34,496,000 |
|  |  |
| Aggregate Total | 85,147,730 |

SEC-SchaattL-E-0003836-37.

e.     "The Company has not been the subject of an independent valuation." *Id.* at SEC SEC-SchaattL-E-0003841.

f.     "This is a private placement and as such Investors will not have the benefit of review of this Memorandum by the SEC or any other agency. Since this offering is a private or nonpublic placement of securities and, as such, is not registered under Federal or state securities laws, investors will not have the benefit of review of this Memorandum by the SEC or any state securities commission." Ex. A at SEC-SchaattL-E-0003842.

g.     "LEGAL PROCEEDINGS The Company is not currently the subject of any litigation." *Id.* at SEC-SchaattL-E-0003856.

19.     The Reven shareholder slide deck made several representations, including, in the "Reven Exit Strategies" section under Scenario 1: "Organize and execute a public offering on a major financial exchange after October 1, 2020 . . . . The company will have the minimum required two years of audited financial statements ending September 30, 2020 making it eligible to offer its

shares for sale in an Initial Public Offering as early as October 2020." Exhibit A at SEC-SchaattL-E-0003902.

20.     The Subscription Agreement states that an investor is "subscrib[ing] to purchase from Reven Holdings, Inc., a Delaware Corporation (the 'Company'), the aggregate amount of Common Stock (the 'Stock') of the Company set forth on the signature page hereof. This subscription is submitted to the Company in accordance with and subject to the terms and conditions described in this Subscription Agreement ('Agreement') and the Confidential Private Placement Memorandum dated August 31, 2018, and all exhibits thereto . . . ." The signed subscription agreement is attached as **Exhibit B, SEC-REVEN-E-0187745-756 at 187745**.

21.     The signature line in the Subscription Agreements stated, "This SUBSCRIPTION AGREEMENT is agreed to and accepted . . . REVEN HOLDINGS, INC. By: . . . Name: Michael Volk Title: Chief Financial Officer." *Id.* at SEC-REVEN-E-0187755.

22.     Based on these representations made to Ms. Schaatt, as well as representations about Reven's drug it was developing, RJX, on or around September 13, 2019, Ms. Schaatt wired $2,000,000 to Reven's bank account and signed the subscription agreement. *Id.*

23.     On September 16, 2019, Ms. Schaatt had a dinner meeting with Lange and Michael Volk. At that meeting, Ms. Schaatt's investment was discussed and she asked for more specific information about how her investment would be used.

24.     The next day, Lange sent Ms. Schaatt, Volk, and Brian Denomme, an email with the subject line, "Use of your investment" that attached a spreadsheet showing what vendor and staff payments Reven needed to make in September 2019, as well as what was past due to various vendors. I understood my investment would be used to pay the amounts listed in the attachment. This email and attachment are attached as **Exhibit C, SEC-SchaattL-E-0000243-245**.

25.      The spreadsheet showed the amount of $50,000 owed to Peter, Brian, and Michael for September. Ms. Schaatt understood that to be the monthly amount Lange, Denomme, and Lange were receiving in compensation, which annualized over a year would have been $600,000 for each. Ex. C at SEC-SchaattL-E-0000245.

26.      As to Ms. Schaatt's 2019 investment, the representations, as described above, made to her by Lange, Volk, Denomme, and in the Reven documents they provided, led Ms. Schaatt to believe that Reven was developing a drug, RJX, for FDA approval, that my investment funds would be used as they represented to her in the PPM and "Use of your investment" spreadsheet they sent me on September 16, 2019, that the representations made to me in the PPM, "Use of your investment" spreadsheet, and shareholder slide deck were true, accurate, and not misleading. These representations were significant to Ms. Schaatt's investment decision. If it had been disclosed to Ms. Schaatt that Reven and Lange, Volk, and Denomme were not going to use my investment to pay vendors and payroll in the amounts shown in the spreadsheet attached to the September 16, 2019 email, that Lange, Volk, and Denomme would take far in excess of the $50,000/month represented in that spreadsheet, that Lange, Volk, and Denomme would take far in excess of the disclosed general administrative and payroll amounts for 2019, that as of the time of Ms. Schaatt's investment in 2019, Reven Pharmaceuticals, Inc., the predecessor to Reven, and Lange had been sued by one of the largest shareholders for securities fraud and fraud, or that Reven did not have accounting books and records or financial statements capable of being audited, such that an audit of its financial statements could not be completed in the near future, Ms. Schaatt would not have made that $2 million investment in September 2019.

27.      Lange emailed Ms. Schaatt, and copied Volk, a few more times in 2019 giving her some updates on Reven and seeking to make connections with any contacts Ms. Schaatt might

have of additional potential investors, including an email on November 10, 2019, on which he copied Volk. This email is attached as **Exhibit D, SEC-SchattL-E-0000240-241.** In that email, Lange represented, among other things, that:

      a.     "We have raised $7 million in October and we raised another $6 million so far in November.";

      b.     "[W]e have one MOU signed with proof of funds for $25 million from two existing shareholders. We have another group that is promising another $25 million and a 3rd group which is also another shareholder promising $30 million.";

      c.     "We were in Mexico and met with Carols and Hector Slim's family office and they brought a woman who runs Roche in Mexico. . . .They want central and South America on an exclusive basis. They have since committed to $25 million but we are not aware of what terms they will be proposing."

      d.     "We will be meeting with Boston Consulting Group to rewrite our assessment and valuation document so it is up to date for submission to majors as we get closer to our S1 being completed sometime in January."

*Id.*

28.     On February 13, 2020, Lange emailed Ms. Schaatt an update, copying Volk. That email is attached as **Exhibit E, SEC-SchaattL-E-0000569-571**. In that update, Lange stated, among other things, in the context of stating that "[a]s of last summer we started focusing on institutional investors and strategic relationships with Fortune 500 type companies and of course they looked at us like were alien for a number of reasons . . . .":

> [W]e finally decide that we would comply with all the ("super smart") investment bankers and file an S1 (the SEC filing to do an IPO),[] and announce to the world that we were going public. We have since done that to allow the "super smart"

people to tick that box, but in reality that's the LAST thing we ever want to do . . . .

So with the illusion of going public, (we already paid our lawyers for the whole things) we are suddenly the sexy girl at the dance and I am being romanced like that sexy girl but the funds are still not here. They are coming but it's a slow process of scrutiny from the "box tickers" and unfortunately it will likely be another 60-90 days before institutional money starts to see our bank account or that we are near the final stages of negotiating a strategic partnership with a major pharma company or conglomerate.

So here is what is going on behind the scenes that few people know or see (we have not publicly made any of these announcements yet, because these things are still not completed):

    A.    Evonik AG in Germany is hot on our trail for a JV agreement (encompassing manufacturing, R&D, and distribution) – we proposed they give us all our required funding of $80 million for certain exclusivity for various aspects of the partnership.

    B.    Hoffman La Roche From Basel Switzerland received all our information yesterday upon request and we hope to hear more in the coming weeks-we are seeking a license deal with them which would be a very traditional pharmaceutical license structure-upfront payment, milestone payments and royalties for a few years until an eventual full buy-out.

    C.    A Michigan investor we have been in discussions with for several weeks now . . . has agreed to fund us $10 million and his lawyers now obviously part of the ("super smart") bunch of people we seem to always meet, have been debating our one pager for 4 weeks now. They say the will be done any day . . . .

Exhibit E at SEC-SchaattL-E-0000570.

29.    In that February 13 email, Lange also stated, in the context of discussing focusing on institutional investors and strategic relationships with Fortune 500 type companies, that "[w]e were too risky because we had to [sic] many shareholders (another mystery to us as all of our shareholders are either friends, family or friends of another person who was already a shareholder - we have no lawsuits from shareholders so we are not sure why this is a negative, but it seems to be a detriment to us)." Ex. E at SEC-SchaattL-E-0000570.

30.     The representations Lange, Volk, and Reven made to Ms. Schaatt in the November 10, 2019 and February 13, 2020 emails that Reven had raised $7 million in October 2019 and another $6 million in November 2019, that other shareholders had promised $80 million to Reven, that there were viable business opportunities in central and south America, that Reven had retained the necessary outside counsel and financial advisors specifically for creating a S-1 registration statement and preparing for a public offering, that there were no lawsuits from shareholders, that Reven had filed an S-1 registration statement, and that it had other viable business opportunities were important to Ms. Schaatt's investment decisions.

31.     On July 8, 2020, Lange sent an email, copying Volk, with the subject line "Reven next 90 day pathway to Covid-19 FDA approval and IPO." In that email Lange stated, "attached is our [July 6, 2020] PPM which will be filed with the SEC in the next 10 days. Our audit should be completed in mid-September early October which will allow us to file our S1 sometime before the end of the year and taking next steps towards an IPO in 2021." This email and attachments are attached as **Exhibit F**, **SEC-SchaattL-0004002-4074**.

a.     The July 6, 2020 PPM attached to that email made several representations, including:

b.     "Reven Holdings, Inc., a Delaware corporation, through its Golden, Colorado based operating company Reven, LLC, is a biopharmaceutical company. Reven's vision is to make a difference in the world by making its products accessible to everyone suffering the effects of vascular and metabolic related diseases. Reven is committed to being the premier, research intensive biopharmaceutical company that advances the health and well-being of people around the world. Its primary product, Rejuveinix (RJX), targets patients suffering from COVID-19, acute respiratory distress syndrome (ARDS), sepsis and septic shock, leukemias and

lymphomas, Alzheimer's disease, Parkinson's disease, Huntington's disease, Amyotrophic lateral sclerosis (ALS), Lou Gehrig's disease, ischemic stroke, non-alcoholic steatohepatitis, chemotherapy associated liver toxicity, Kawasaki disease, vascular and metabolic related diseases as well as specific patient populations suffering PAD and other cardiovascular related medical conditions." *Id.* at SEC-SchaattL-E-0004014.

      c.    "No independent valuation has been obtained. The Company has not obtained an independent opinion regarding the valuation of the Company or the Shares, nor has there been any legal, investment banking, or other diligence in connection with the valuation of the Company or the Shares." *Id.* at SEC- SEC-SchaattL-E-0004039.

      d.    "Corporate Information We were incorporated on August 14, 2018 under the laws of the State of Delaware. In addition, our wholly-owned subsidiary, Reven, LLC *('Reven Sub'),* was also formed on August 14, 2018 under the laws of the State of Delaware. . . . On August 21, 2018, we entered into an Asset Contribution Agreement and Plan of Reorganization (the *'Reorganization Agreement')* with Reven Pharmaceuticals, Inc., a Florida corporation (the *'Oldco')* and Reven Sub, whereby Oldco contributed all of its assets to Reven Sub in exchange for 392,431,372 shares of our common stock, which Oldco subsequently distributed to its shareholders (the *'Reorganization').* The Oldco was subsequently dissolved. As a result of the Reorganization, we are a successor company to Oldco." *Id.* at SEC-SchaattL-E-0004041.

      e.    "Intellectual Property[.] We believe we have an extensive patent portfolio and substantial know-how relating to Rejuvenixix. Our patent portfolio, described more fully below, includes claims directed to the composition of Rejuveinix and methods of use. As of July 1, 2020, the patents of which we are either the owner of record of or own the contractual right to include six (6) issued U.S. patents and five (5) issued non-U.S. patents. We are actively pursuing

an additional five (5) U.S. patent applications, of which three (3) are provisional and two (2) are non-provisional. We are in the process of drafting several additional U.S. and international patent applications." *Id.* at SEC-SchaattL-E-0004053.

f.       The PPM goes on to list both Issued Patents and Pending Patent Applications both in the U.S. and abroad, as well as trademarks and service marks. *Id.* at SEC-SEC-SchaattL-E-0004054-56.

g.       "Research and Development[.] We have approximately 22 full time employees dedicated to research and development. Our research and development operations are located in Golden, Colorado and Northville, Michigan." *Id.* at SEC-SchaattL-E-0004056.

h.       "Legal Proceedings[.] From time to time we may be involved in litigation relating to claims arising out of the operation of our business in the normal course of business. As of the date of this Memorandum we are not aware of potential dispute or pending litigation and are not currently involved in a litigation proceeding or governmental actions the outcome of which in management's opinion would be material to our financial condition or results of operations." *Id.* at SEC-SchaattL-E-0004061.

i.       "Involvement in Certain Legal Proceedings

Our directors and executive officers have not been involved in any of the following events during the past ten years:

1.   any bankruptcy petition filed by or against such person or any business of which such person was a general partner or executive officer either at the time of the bankruptcy or within two years prior to that time;

2.   any conviction in a criminal proceeding or being subject to a pending criminal proceeding (excluding traffic violations and other minor offenses);

13

3. being subject to any order, judgment, or decree, not subsequently reversed, suspended or vacated, of any court of competent jurisdiction, permanently or temporarily enjoining him from or otherwise limiting his involvement in any type of business, securities or banking activities or to be associated with any person practicing in banking or securities activities;

4. being found by a court of competent jurisdiction in a civil action, the SEC or the Commodity Futures Trading Commission to have violated a federal or state securities or commodities law, and the judgment has not been reversed, suspended, or vacated;

5. being subject of, or a party to, any federal or state judicial or administrative order, judgment decree, or finding, not subsequently reversed, suspended or vacated, relating to an alleged violation of any federal or state securities or commodities law or regulation, any law or regulation respecting financial institutions or insurance companies, or any law or regulation prohibiting mail or wire fraud or fraud in connection with any business entity; or

6. being subject of or party to any sanction or order, not subsequently reversed, suspended, or vacated, of any self-regulatory organization, any registered entity or any equivalent exchange, association, entity or organization that has disciplinary authority over its members or person associated with a member."

*Id.* at SEC-SchaattL-E-0004064-65.

j.      The "Executive Compensation" section of the July 6, 2020 PPM represented as follows:

## EXECUTIVE COMPENSATION

### Executive Officer Compensation

The following table sets forth the annual and long-term compensation paid to our Chief Executive Officer and the other executive officers who earned more than $100,000 per year at the end of the last two completed fiscal years. We refer to all of these officers collectively as our "named executive officers."

### Summary Compensation Table

| Name | Position | Year | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | Change in Pension Value and Non-Qualified Deferred Compensation Earnings ($) | All Other Compensation ($) | Total ($) |
|------|----------|------|-----------|-----------|------------------|-------------------|---------------------------------------------|------------------------------------------------------------------------------|----------------------------|-----------|
| Peter Lange | Chief Executive Ofcr & Director | 2020 | 660,000 | 0 | | | | | | 660,000 |
| | | 2019 | 540,000 | 0 | | | | | | 540,000 |
| Brian Denomme | Chief Operating Ofcr & Director | 2020 | 660,000 | 0 | | | | | | 660,000 |
| | | 2019 | 540,000 | 0 | | | | | | 540,000 |
| Michael Volk | Chief Strategy Ofcr & Director | 2020 | 660,000 | 0 | | | | | | 660,000 |
| | | 2019 | 540,000 | 0 | | | | | | 540,000 |

Ex. F at SEC-SchaattL-E-0004066.

k.      "Director Compensation All of our directors are employees and do not receive additional compensation for serving as director." Id. at SEC-SchaattL-E-0004067.

l.      "Private Offering exemption[.] This Offering is being made in reliance on an exemption from registration contained in the Securities Act and the rules and regulations provided thereunder, and on similar exemptions from the qualification provisions of applicable state securities laws. No regulatory authority has reviewed the terms of this Offering, the disclosure of risks and the fairness of the terms of the Offering or the business of the Company." Id. at SEC-SchaattL-E-0004039.

32.    On July 28, 2020, Lange emailed Ms. Schaatt, copying Volk, further updates and told her about Reven's newest data and attached numerous documents about the update. That email is attached as **Exhibit G, SEC-SchaattL-E-0000474-476**. In that email, Lange stated, among other things, "We have signed an agreement giving Reven a $20 million dollar manufacturing credit from our manufacturer in exchange for 2 million shares" and "In order to qualify to receive an order from the US government for our Covid-19 therapy we are required to show we can deliver 50,000 treatments a month. We will demonstrate that in October 2020."

33.     Throughout the rest of 2020, Lange, Volk, and Reven continued to solicit money from Ms. Schaatt, but she did not invest any more money at that time.

34.     On July 13, 2021, Ms. Schaatt met with Volk and Lange in person. They told Ms. Schaatt that RJX was in phase II clinical trials and that Reven was planning a direct public offering ("DPO") in September or October, likely on the New York Stock Exchange. In addition to giving Ms. Schaatt this information, they also solicited more money from her in the form of a pre-direct public offering private listing.

35.     The next day, Volk, copying Lange and Denomme, emailed Ms. Schaatt and attached a document describing the deal structure they were proposing to raise the final funds prior to Reven's DPO. That email and attachment are attached as **Exhibit H, SEC-SchaattL-E-0000661-664**.

36.     In the document attached to that email, "Reven Holdings Pre-Direct Public Offering Brief and Deal Structure," Reven, Lange, Volk, and Denomme (who were listed at the end of the document after the statement, "For further information contact:") represented that

> Reven is currently preparing for a Direct Public Offering of their stock on a major stock exchange to occur September/October 2021. The company intends on filing its S-1 registration statement as early as August as a required final step outlining the specific details of the offering as well as competing [sic] formal registration of the company's authorized and issued capital. Reven has completed all of the necessary groundwork to accomplish a listing and public offering of its shares with the exception of the completion of its financial audit. The company intends on selling 5,000,000 newly issued shares in the direct public offering priced at $5.00/share to raise $25 Million for the continued support of its clinical development program. Prior to the offering, Reven is seeking to raise an additional $7.5 million to complete the current in-process trials and provide the required financial support to complete the public offering.

> This pre-public offering is being presented to existing shareholders as a final opportunity to purchase shares prior to the company being listed on a public exchange. There is no obligation for any shareholder to participate in this offering, and everyone will be able to acquire additional shares once the listing is completed and the shares are freely trading on the exchange of choice at whatever the market price may be at the time. . . .

***

**Parent Company/Issuing Company:** Reven Holdings, Inc. a Delaware Corporation

**IP/Patent Owner:** Reven IP Holdings, LLC a wholly owned subsidiary of Reven Holdings, Inc.

**Number of Pre-Listing Shares being Issued:** 7,500,000

**Class of Shares:** Common stock (ALL authorized and issued Reven shares are common)

**Pre-Listing Price Per Share for this Offering:** $1.00

**Anticipated Listing Price:** $5.00 - $7.00

**Anticipated Exchange:** NYSE or NASDAQ - NYSE is the exchange of choice for DPO

Exhibit H at SEC-SchaattL-E-0000662-663.

37.     Based on the representations made to Ms. Schaatt, she wired $2,000,000 on or around July 16, 2021 and $3,000,000 on or around August 27, 2021 to Reven's Wells Fargo bank account to buy additional stock in Reven at $1.00 a share.

38.     Ms. Schaatt signed a subscription agreement to buy $5,000,000 in additional Reven stock. That subscription agreement is dated September 15, 2021. The email sending the signed agreement to Reven and the signed subscription agreement is attached as **Exhibit I, SEC-SchaattL-E-0000692-703**. The subscription agreement states, similar to the first subscription agreement Ms. Schaatt signed (except for referring to the July 6, 2020 PPM instead of the August 31, 2018 PPM), that Ms. Schaatt submitted the subscription agreement "in accordance with and subject to the terms and conditions described in this Subscription Agreement . . . and the Confidential Private Placement Memorandum dated July 6, 2020, and all exhibits thereto including the form of the Stock as it may be supplemented and amended (collectively, the 'Memorandum'), which is incorporated into and made part of this Agreement . . . ." *Id.* at SEC-SchaattL-E-0000693.

39.    The signature line in the September 15, 2021 Subscription Agreement stated, "This SUBSCRIPTION AGREEMENT is agreed to and accepted . . . REVEN HOLDINGS, INC. By: . . . Name: Michael Volk Title: Chief Financial Officer." *Id.* at SEC-SchaattL-E-0000703.

40.    Based on the above representations about the status of Reven and its proceeding to a DPO, Ms. Schaatt introduced Volk to a business partner. Volk and Lange solicited him to invest in the pre-DPO offering too.

41.    On December 16, 2021, Lange emailed Ms. Schaatt a new investor slide deck that he said Reven was sending to institutions they were speaking to. That email and attachment are attached as **Exhibit J, SEC-SchaattL-E-0004075**. That investor slide deck represented, among other things, in the section entitled, "Volume, Growth, Success & ROI Strategic Paths Forward," in the "Going Public" section under "Organize and execute an initial Public Offering" that the "Company has the minimum required two years of audited financial statements ending August 2021." *Id.* at SEC-SchaattL-E-0004094.

42.    Ms. Schaatt responded by asking, "What's the latest on the DPO? Is that path forward still in the cards?" Lange then responded, copying Volk: "We are working with a number of options we want to close immediately. As I have more facts I will share as soon as I can. We are so close to everything getting finished." The full email chain is attached as **Exhibit K, SEC-SchaattL-E-0000689-690**.

43.    As to Ms. Schaatt's 2021 investments, the representations, as described above, made to Ms. Schaatt by Lange, Volk, Denomme and in the Reven documents they provided led her to believe that Reven was preparing for a DPO on the NYSE or NASDAQ in September or October 2021, that the company would file a S-1 registration statement in August or shortly thereafter (even though Lange, Volk, and Reven had represented to me in the February 13, 2020

email that they had already filed one), that Reven had completed all the necessary steps to list in a DPO except for completing an audit of its financial statements, that an audit of Reven's financial statements would be imminently completed, and that my investment would be used to complete the current in-process phase II trials and provide the required financial support to complete the public offering were crucial to my decision to invest another $5 million. If, instead, it had been disclosed to Ms. Schaatt that they had not completed all the steps for a DPO or to file a S-1 registration statement, that no audit firm had been engaged to complete an audit of Reven's financial statements, that no audit had even started, that Reven's books and records were not in a state that made them auditable or of an audit being completed, and that even part of my investment would not be used to complete the Phase II trials or complete the steps for a DPO, Ms. Schaatt would not have invested.

44.     In 2022 Ms. Schaatt continued to receive updates on Reven via email and phone calls with Volk and Lange.

45.     In September and October 2022, Lange, Volk, Denomme, and Reven started soliciting Ms. Schaatt for additional investments in Reven.

46.     On September 14, 2022, Ms. Schaatt had a phone call with Lange in which he provided an update. He told Ms. Schaatt that Reven needed to pay its vendors approximately $4-5 million in order for them to release data from Reven's phase II trial involving RJX.

47.     That same day, Lange, copying Volk, followed up with an email stating the same. He attached to that email a slide deck, stating, "I have attached the document we put together as a summation of the trial data." That email and attachment are attached as **Exhibit L, SEC-SchaatL-E-0000114-137**.

48.     That slide deck made various representations, including:

a.      That Dr. Fatih Uckun was Reven's Chief Medical Officer & Chief Scientist and that Jeff Halverson was Chief Financial Officer. *Id.* at SEC-SchaatL-E-0000134.

b.      In the section entitled, "Volume, Growth, Success & ROI Strategic Paths Forward," in the "Going Public" section about "Organize and execute an initial Public Offering" that the "Company has the minimum required two years of audited financial statements ending August 2021." *Id.* at SEC-SchaatL-E-0000136.

49.     Around the first week of October, Lange called and asked Ms. Schaatt if she would state in an email that she was investing $10 million. Lange said he wanted to show this email to another investor in Michigan in order to trigger an option this investor had to invest an additional $3.6 million. Ms. Schaatt told Lange that she was not able to invest at that time and would not mislead another shareholder or investor.

50.     Volk set up a Zoom call with Ms. Schaatt and other individuals who Ms. Schaatt believe constitute some of, if not the, largest investors in Reven, as well as Lange and Denomme for October 6, 2022. The purpose of the meeting was to give us an update on Reven and to solicit Ms. Schaatt for more investment funds. An email chain with the meeting reminder for the October 6, 2022 Zoom call is attached as **Exhibit M, SEC-SchaattL-E-00000083-85**.

51.     On that Zoom call, Ms. Schaatt told Volk, Lange, and Denomme that before she could make any decision about additional investments Ms. Schaatt needed to know what was happening with the SEC investigation. Volk, Lange, and Denomme told Ms. Schaatt and the other investors that the SEC investigation would be over shortly, that they did nothing wrong, and that they provided all documents to the SEC as requested. They told Ms. Schaatt that the investigation started because of a disgruntled investor who had invested only $8,000. Lange said, "Don't worry,

we have people in Michigan who can take care of that." Ms. Schaatt understood Lange's comment as a threat and intimidation.

52.    On that same call, Volk told Ms. Schaatt that the SEC investigation would reveal that the company had been paying his mortgage. He further told Ms. Schaatt that it was okay that Reven had been paying his mortgage because it was accounted for as his compensation. When Ms. Schaatt heard this, she became very concerned.

53.    Volk also told Ms. Schaatt that he had seen the results of the phase II clinical trials for RJX because he had the "unblinding codes" and assured us that the results were overwhelmingly positive.

54.    Volk, Lange, and Denomme also told Ms. Schaatt on that call that what was preventing Reven from going into bankruptcy was that Reven owed the three of them large amounts of back pay. They told Ms. Schaatt that they would be the largest creditors in any bankruptcy, such that they would have first priority in bankruptcy and the first right to the only asset of Reven—its intellectual property.

55.    If Reven and Volk, Lange, and Denomme had disclosed to Ms. Schaatt that they were owed substantial amounts of money in back pay from Reven and that Ms. Schaatt's investments would have been used to pay them this alleged back pay that would have been important to her investment decision and Ms. Schaatt would not have invested.

56.    The next day, Volk, copying Lange and Denomme, sent Ms. Schaatt and other individuals who were on the October 6 Zoom call, an attached Excel spreadsheet with outstanding payables. That email and attachment are attached as **Exhibit N, SEC-SchaattL-E-0000068-69**.

57.    After that call, Lange, copying Volk and Denomme, continued to email Ms. Schaatt to solicit her to invest more money in Reven or to loan it or Lange, Volk, and Denomme money.

58.    On October 17, 2022, Lange arranged a conference call with Ms. Schaatt and another large Reven investor. On that call, Lange told Ms. Schaatt, among other things, that one of the Reven board members was presenting documentation on RJX to the Sheikh of Dubai. Lange also told Ms. Schaatt he was in discussions with another company to buy Reven's intellectual property portfolio for $500 million. He explained that this transaction would allow Reven to eliminate to the SEC investigation by rescinding all of the outstanding shares in Reven. He further stated that if Ms. Schaatt could invest an additional $1 million, possibly in the form of a loan, Ms. Schaatt would serve as the lead investor behind which other investors would follow.

59.    Later on October 17, Lange emailed Ms. Schaatt a draft financing agreement whereby he proposed Ms. Schaatt make a $5 million loan to Lange, Volk, and Denomme personally, jointly and severally, not to Reven. The loan was to be secured by a collateral pledge agreement for 15 million shares in Reven and provided for a conversion of the loan to equity in the form of Reven shares from Lange, Volk, and Denomme. That email and attached draft financing agreement are attached as **Exhibit O, SEC-SchaattL-E-0004101-4104.** Ms. Schaatt did not respond to this request.

60.    Lange sent Ms. Schaatt a text on October 18, 2022, saying, among other things "if you can commit to $1 million [investor 2] will do his $500-700k and I will get [investor 3] to do a million then we will make this happen with the other leads I am working on. . . . Please remember I only started raising capital 6 weeks ago. it [sic] takes a little time to get things going with all my people. But first money breaks the dam. You and [investor 2] will be our saviors to get everyone else to step up in these trying times. Then we will get this done." Text Message attached as **Exhibit P, SEC-SchaattL-E-0004098-4099.** Ms. Schaatt did not respond to this text.

61.     Despite Lange's, Volk's, and Denomme's requests, at no time from September 2022 through the present did Ms. Schaatt ever agree, commit, or suggest that she would make any further investments in Reven.

62.     To date, Ms. Schaatt has not received any of her $7 million investment back, nor has she received any other payments.

## CAUSES OF ACTION

### First Cause of Action: Federal Securities Fraud Claim

63.     Plaintiff realleges and incorporates by reference in this claim the allegations set forth above.

64.     At all relevant times, Defendants were subject to the anti-fraud provisions of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. section 78j(b) promulgated under 17 C.F.R. section 240.10b-5.

65.     Lang, Denomme, and Volk, by and through Reven, intentionally and knowingly made misstatements and omissions of material facts in connection with the sale of securities, including but not limited to false statements regarding the financial condition of Reven, its business prospects, and other material information relating to Reven's operations and future, which were designed to deceive, manipulate, and defraud Ms. Schaatt.

66.     The Defendants knowingly made these material misrepresentations in connection with the offer, sale, and purchase of securities knowing that Ms. Schaatt, as an investor, would rely on these statements and omissions in deciding whether to purchase or sell such securities. Specifically, Defendants misrepresented the financial condition of Reven, its future prospects, profitability, and concealed adverse material facts.

67.     Ms. Schaatt, reasonably relying upon the material misrepresentations and false statements made by Defendants, invested $7 million in Reven via subscription agreements because she was led to believe her money would be used to develop RJX.

68.     As a direct and proximate cause of Defendants' fraudulent conduct, Ms. Schaatt has suffered economic damages in an amount to be proven at trial.

**Second Cause of Action: Colorado State Securities Law Fraud Claim**

69.     Plaintiff realleges and incorporates by reference in this claim the allegations set forth above.

69.     Lang, Denomme, and Volk, by and through Reven, intentionally and knowingly made misrepresentations and omissions of material fact and directly and proximately caused Ms. Schaatt to purchase and invest a total of $7 million in Reven via subscription agreements.

70.     Based on Defendants' misrepresentation, Ms. Schaatt invested and purchased such an interest because she was fraudulently led to believe her money would be used to develop RJX.

71.     The Defendants knowingly conspired to and issued untrue statements of material fact in connection with the offering, sale, and purchase of a security interest in Reven in violation of Colorado Securities Act, C.R.S. § 11-51 *et. seq.*

72.     Ms. Schaatt reasonably relied upon the conduct of the Defendants to her financial detriment and the Defendants' conduct caused Ms. Schaatt economic damages.

73.     As a direct and proximate cause of Defendants' fraudulent conduct, Ms. Schaatt has suffered damages in an amount to be proven at trial.

**Third Cause of Action: Consumer Protection Act Claim**

74.     Plaintiff realleges and incorporates by reference in this claim the allegations set forth above.

75.      Lang, Denomme, and Volk, by and through Reven, have engaged in unfair and deceptive acts by deliberately and intentionally making untrue statements of material fact regarding Reven and its future profitability.

76.      The Defendants' misrepresentations and deceptive acts were material and had the potential to mislead a reasonable investor and consumer.

77.      The Defendants knowingly and intentionally misled and deceived Ms. Schaatt and acted with reckless disregard for the truth as to Reven and the purpose and use of Ms. Schaatt's investment.   The Defendants made such misrepresentations to Ms. Schaatt as well as other investors.

78.      Ms. Schaatt reasonably relied upon the Defendants misrepresentations, deceptive conduct, and material misrepresentations in deciding to invest monies in Reven.

79.      The Defendants' deceptive and fraudulent conduct significantly impacts the public interest.  Ms. Schaatt, as an investor, suffered an injury to a legally protected interested by making purchases and investing money in Reven in reliance on the Defendants' false statements.

80.      Defendants directly caused Ms. Schaatt, among other investors, financial harm in violation of Colorado's Consumer Protection Act, C.R.S. § 6-1 *et seq*.

**Fourth Cause of Action: Fraudulent Misrepresentation Claim**

81.      Plaintiff realleges and incorporates by reference in this claim the allegations set forth above.

82.      Lang, Denomme, and Volk, by and through Reven, made material and fraudulent misrepresentations and false statements regarding Reven and the use and purpose of Ms. Schaatt's investment.  The Defendants made such material misrepresentations with knowledge and intent and in a concerted effort to induce Ms. Schaatt into making an investment into Reven.

83.     Ms. Schaatt materially relied upon such misrepresentations in connection with her investment in Reven.

84.     Defendants knew that their representations and deceptive acts as stated herein were false at the time they were made, and the Defendants acted with a reckless disregard for the truth at all relevant times.

85.     Ms. Schaatt justifiably relied upon these false statements and omissions made by Denomme, Volk, and Long when deciding to invest in Reven.

86.     Ms. Schaatt has suffered actual harm as a direct and proximate cause of the Defendants' fraudulent acts, including loss of her investment.

**Fifth Cause of Action: Fraudulent Concealment Claim**

87.     Plaintiff realleges and incorporates by reference in this claim the allegations set forth above.

88.     Lang, Denomme, and Volk, by and through Reven, knowingly concealed material facts regarding Reven and the use and purpose of Ms. Schaatt's investment.

89.     The Defendants concealed material facts in a concerted effort to induce Ms. Schaatt into making an investment into Reven.

90.     Ms. Schaatt was unaware that Defendants were concealing material facts, and invested in Reven.

91.     Ms. Schaatt has suffered actual harm as a direct and proximate cause of the Defendants' concealment, including loss of her investment.

**Sixth Cause of Action: Fraudulent Inducement Claim**

92.     Plaintiff realleges and incorporates by reference in this claim the allegations set forth above.

93.     Lang, Denomme, and Volk, by and through Reven, made material and fraudulent misrepresentations and false statements regarding Reven and the use and purpose of Ms. Schaatt's investment in a concerted effort to induce Ms. Schaatt into entering into the subscription agreements and making an investment into Reven.

94.     Ms. Schaatt materially relied upon such misrepresentations in connection with entering into the subscription agreements and her investment in Reven.

95.     Defendants knew that their representations and deceptive acts as stated herein were false at the time they were made, and the Defendants acted with a reckless disregard for the truth at all relevant times.

96.     Ms. Schaatt justifiably relied upon these false statements and omissions made by Denomme, Volk, and Long when deciding to enter into the subscription agreements and invest in Reven.

97.     Ms. Schaatt has suffered actual harm as a direct and proximate cause of the Defendants' fraudulent acts, including loss of her investment.

**Seventh Cause of Action: Breach of Contract Claim**

98.     Plaintiff realleges and incorporates by reference in this claim the allegations set forth above.

99.     A valid and enforceable contract existed between Ms. Schaatt and the Defendant Reven.

100.    Ms. Schaatt performed all of her obligations under the relevant agreements and supplied Defendants with $7 million consistent with the contracts' terms.

101.    Defendant failed to perform its obligation under the agreement or has otherwise breached its contract with Ms. Schaatt.

102.    Ms. Schaatt has suffered damages as a direct and proximate cause of the Defendant's breach including but not limited to economic loss.

### Eighth Cause of Action: Civil Theft Claim

103.    Plaintiff realleges and incorporates by reference in this claim the allegations set forth above.

104.    Lang, Denomme, and Volk, by and through Reven, intentionally took funds and Ms. Schaatt's right to funds with the intent to permanently deprive her from the use of such funds.

105.    Defendants' actions and civil theft of Ms. Schaatt's $7 million investment was willful and in violation of C.R.S. § 18-4-405.

106.    Ms. Schaatt has suffered damages as a direct and proximate cause of the Defendants' civil theft in an amount to be proven at trial.

### Ninth Cause of Action: Conversion Claim

107.    Plaintiff realleges and incorporates by reference in this claim the allegations set forth above.

108.    Ms. Schaatt had an ownership interest in the money and investment that she provided to Lang, Denomme, and Volk by and through Reven.

109.    The Defendants intentionally and fraudulently took control of Ms. Schaatt's property through deception as stated herein.

110.    Ms. Schaatt has suffered damages as a direct and proximate cause of the Defendants' conversion in an amount to be proven at trial.

### Tenth Cause of Action: Negligent Misrepresentation

111.    Plaintiff realleges and incorporates by reference in this claim the allegations set forth above.

112.   Lang, Denomme, and Volk, by and through Reven, made material misrepresentations and false statements regarding Reven and the use and purpose of Ms. Schaatt's investment.   The Defendants made such material misrepresentations induce Ms. Schaatt into making an investment into Reven.

113.   Ms. Schaatt materially relied upon such misrepresentations in connection with her investment in Reven.

114.   Defendants knew or should have known that their representations and deceptive acts as stated herein were false at the time they were made, and the Defendants acted with a reckless disregard for the truth at all relevant times.

115.   Ms. Schaatt justifiably relied upon these false statements and omissions made by Denomme, Volk, and Long when deciding to invest in Reven.

116.   Ms. Schaatt has suffered actual harm as a direct and proximate cause of the Defendants' fraudulent acts, including loss of her investment.

**Eleventh Cause of Action: Fraudulent Transfer (C.R.S. §§ 38-8-101 to -112)**

117.   Plaintiff realleges and incorporates by reference in this claim the allegations set forth above.

118.   Defendants misappropriated Ms. Schaatt's investment money through various means by distributing and transferring the funds to third parties, including but not limited to funneling money through a shell company, directing funds to third-parties for non-business purposes, buying expensive jewelry, paying personal expenses.

119.   The funds transferred by Defendants were transferred with the intent to hinder, delay, or defraud a creditors, including Ms. Schaatt.

120.    Lang, Denomme, and Volk, using their control over Reven's and Reven Pharmaceuticals' bank accounts, transferred over $1.8 million to Health Analytics. *See* Donna B. Walker Decl. ¶ 18(d), *SEC v. Reven Holdings, Inc. et al.*, No. 1:22-cv-03181-DDD-SBP (D. Colo. Dec. 9, 2022), ECF No. 8.

121.    Lang, Denomme, and Volk formed Health Analytics as a pass-through or shell company to facilitate the transferring of investor money to themselves.

122.    Health Analytics provided no goods or services to Reven or Reven Pharmaceuticals.

123.    Upon information and belief, Reven and Reven Pharmaceuticals transferred money and other assets to unknown persons, John Doe/Jane Doe.

124.    All such transfers from Reven to Lang, Denomme, Volk, Health Analytics & Research Services, LLC, and/or John Doe/Jane Doe constitute a fraudulent transfer within the meaning of C.R.S. § 38-8-105.

125.    As a result of any fraudulent transfers committed by Defendants, Ms. Schaatt has been damaged in amounts to be proved at the time of trial, plus all continuing charges, costs, and attorneys' fees and is also entitled to all relief requested herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Leah Schaatt requests that the Court enter judgment in its favor against Defendants as follows:

A.    Award of damages in an amount to be proven at trial;

B.    Award of treble damages in an amount to be determined at trial plus interest at the statutory rate;

C.    Award of reasonable attorneys' fees and costs;

D.      Award of pre- and post-judgment interest; and

E.      Enter any other relief as the Court deems just and proper.

**PLAINTIFF REQUESTS A JURY TRIAL ON ALL MATTERS SO TRIABLE.**

Respectfully submitted,


Dated: December 23, 2024                    */s/ Patrick R. Akers*
                                            David A. Laird (31067)
                                            Patrick R. Akers (54803)
                                            FENNEMORE CRAIG, P.C.
                                            3615 Delgany Street, Suite 1100
                                            Denver, Colorado 80216
                                            (303) 291-3200
                                            (303) 291-3201 (facsimile)
                                            dlaird@fennemorelaw.com
                                            pakers@fennemorelaw.com

                                            Sean V. Small (Wash. 37018)
                                            Paul J. Spadafora (Wash. 49777)
                                            LASHER HOLZAPFEL SPERRY & EBBERSON PLLC
                                            601 Union St, Suite 2600
                                            Seattle, WA 98101
                                            (206) 624-1230
                                            small@lasher.com
                                            spadafora@lasher.com

                                            *Counsel for Leah Schaatt*